# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
   **Plaintiff,**

  v.              Case No. 09-CR-54

**BLAKE WILSON**
   **Defendant.**

## SENTENCING MEMORANDUM

  Law enforcement learned that a man named Eureka Hopson was in the business of robbing drug dealers. Posing as a cocaine trafficker from New York, an undercover agent devised a plan with Hopson whereby they would rob the agent's "supplier" of fourteen kilograms of cocaine. Hopson's associate, Xavier Turner, recruited six other men (who had gathered at the residence of a man named Deshaun Baldwin) to participate in the crime. Defendant Blake Wilson was one of them.

  Agents arrested the men, and defendant agreed to plead guilty to attempted obstruction of commerce by robbery, contrary to 18 U.S.C. § 1951. I ordered a pre-sentence report ("PSR") and set the case for sentencing. In imposing sentence, the district court must first calculate the advisory sentencing guideline range, then determine the ultimate sentence under all of the factors set forth in 18 U.S.C. § 3553(a). See, e.g., United States v. Bush, 523 F.3d 727, 729 (7th Cir. 2008). This memorandum sets forth written reasons for my determinations.

## I. GUIDELINES

  Defendant's PSR set a base offense level of 20, U.S.S.G. § 2B3.1(a), then added enhancements of 5 levels for firearm possession, § 2B3.1(b)(2)(C), and 1 level because the

taking of a controlled substance "was an object of the offense," § 2B3.1(b)(6), for an adjusted level of 26. The report declined to deduct 3 levels under the attempt guideline, § 2X1.1(b)(1), but did subtract 3 levels for acceptance of responsibility, § 3E1.1, for a final level of 23. The PSR then set a criminal history category of III based on a criminal history score of 5.[1]

Defendant objected to the offense level enhancements and the criminal history points under § 4A1.1(e). (PSR ¶¶ 31, 32 & 48.) The government supported the enhancements and criminal history scoring in the PSR, but believed that defendant qualified to the attempt reduction under § 2X1.1. At sentencing, defendant also argued for the attempt reduction. (PSR ¶ 34.)

### A.     Firearm Possession Enhancement

Under U.S.S.G. § 2B3.1(b)(2)(C), "if a firearm was brandished or possessed, increase by 5 levels." Defendant admitted that police recovered three guns when he and his cohorts were arrested, including one found at his feet in the car in which he was a passenger. The PSR indicated that this gun fell out of co-defendant Johnny Gilliam's lap. (PSR ¶ 21.) Defendant argued that the facts set forth in the PSR failed to establish that he knew Gilliam possessed the gun before Gilliam dropped it. Defendant also claimed that he did not personally possess a gun, and that there was no evidence that he participated in the planning of the offense, such that it was foreseeable to him that firearms would be involved.

Under U.S.S.G. § 1B1.3, a defendant is responsible for all acts and omissions he

---

[1] The report assessed 1 point under U.S.S.G. § 4A1.1(c) for a 2005 marijuana possession case (sentence: $200 fine); 2 points under U.S.S.G. §§ 4A1.1(b) & (k) for a 2005 marijuana possession, resisting an officer, and bail jumping case (sentence: 6 months jail after revocation of probation); and 2 points under U.S.S.G. § 4A1.1(e) because defendant committed the instant offense in January 2008, less than two years after his May 2007 release from the 6 month jail sentence.

committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused, and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity. Courts have held that under this relevant conduct provision a defendant may be held responsible for the reasonably foreseeable firearm possession of co-actors under § 2B3.1(b)(2)(C). See, e.g., United States v. Dorsey, 209 F.3d 965, 967-68 (7th Cir. 2000); United States v. Medina, 74 F.3d 413, 417-18 (2d Cir. 1996).

In the present case, defendant admitted that he joined a group of men to rob a cocaine supplier. Although he arrived at Deshaun Baldwin's house later than the other participants, the facts set forth in the PSR and in defendant's plea agreement established that defendant was present when the men discussed the robbery, including that it was going to be for fourteen "bricks," street slang for cocaine. All of the men agreed to join in the robbery.

Defendant was also present when Xavier Turner, the head of the assembled group at Baldwin's house, spoke to Eureka Hopson, the leader of the entire scheme, on speaker phone. As the men left to commit the robbery, co-defendant James Ware was in possession of a firearm. Baldwin also saw this defendant in possession of a firearm in the residence, although Baldwin was not sure whose gun it was. Gilliam had his own gun, and Baldwin had a gun too.

The men left Baldwin's house in two cars, with defendant and Gilliam riding in a vehicle driven by Turner. They met Hopson on the street, and Hopson looked at and handled Gilliam's gun; Hopson's prints were later found on that gun. Turner got into Hopson's car, and Gilliam then drove their car with defendant as the passenger. The group then proceeded to the Mitchell Domes in three cars, where they met the undercover agent, and he asked if they were ready. The agent also said the robbery involved fourteen "keys" – slang for kilograms – and

3

asked if everyone was straight on that. The agent then led the men to another location, where they were all arrested. As indicated above, police recovered three guns from the cars, one of which was at defendant's feet, but which Gilliam later admitted was his.

The record contained no evidence that defendant personally possessed a gun after the men left Baldwin's house. However, even if defendant did not provide his own gun or carry one after they left Baldwin's residence, the facts clearly established that defendant knew firearms were involved in the offense. He was present at Baldwin's house when the others prepared for the robbery and armed themselves; he was present in the car when Hopson handled Gilliam's gun; and that gun ended up at his feet after it fell out of Gilliam's lap when the police arrested the defendants. I found it highly unlikely that defendant would be unaware of the gun in Gilliam's lap.

Even if defendant was somehow blind to the fact that the other men actually carried these specific guns as they left Baldwin's house, the notion that it was not foreseeable to him that his co-actors, intent on robbing a drug supplier of a large amount of cocaine, would not carry firearms was quite implausible. See United States v. Emerson, 501 F.3d 804, 815 (7th Cir. 2007). In any event, I found that under these circumstances, defendant did know that the others involved in this robbery possessed guns in furtherance of the scheme to commit the robbery, which defendant joined.

Further, as indicated in both the PSR (PSR ¶ 16) and the factual basis section of defendant's plea agreement (Plea Agreement at 4), Deshaun Baldwin saw defendant in possession of a gun in Baldwin's residence. This further demonstrated defendant's knowledge that firearms were involved. At sentencing, defendant denied any personal firearm possession, but I noted that even if he could deny what he previously conceded in the plea agreement,

4

defendant offered no support for his contention. The Seventh Circuit has long held that district courts may rely on information contained in a PSR so long as it is well-supported and appears reliable. See, e.g., United States v. Moreno-Padilla, 602 F.3d 802, 808-09 (7th Cir. 2010) (citing United States v. Heckel, 570 F.3d 791, 795 (7th Cir. 2009); United States v. Salinas, 365 F.3d 582, 587 (7th Cir. 2004); United States v. Mustread, 42 F.3d 1097, 1101-02 (7th Cir. 1994)). And when the court relies on a PSR, it is the defendant's task to show that the facts contained in the report are inaccurate. He must produce some evidence that calls the reliability or correctness of the alleged facts into question; a bare denial is not enough. See Mustread, 42 F.3d at 1101-02. Only if the defendant's objection creates real doubt as to the reliability of the information in the PSR does the government have the burden of independently demonstrating the accuracy of the information. See Moreno-Padilla, 602 F.3d at 809.

I found Baldwin's statement as to defendant's personal firearm possession credible and reliable. Baldwin's statements about what happened in this case were entirely consistent with the other evidence in the case, including the undercover officer's dealings with Hopson; the statements of the other cooperators present at Baldwin's house, including Gilliam; the phone records verifying the calls between Hopson and Turner at Baldwin's house; the discovery of Hopson's prints on Gilliam's gun; and Ware's jailhouse confession to another inmate.

Defendant, on the other hand, lacked credibility. After his arrest, he was interviewed twice by investigators, both times denying that he had been with the co-defendants earlier that day at Baldwin's house. Rather, he said that he was waiting for a bus when Gilliam drove up and offered him a ride. In the first interview, he stated that Gilliam was going to give him a ride to Potawatomi Casino to meet his girlfriend, Keneesha; he said he did not remember stopping at the Mitchell Domes, where they met the undercover agent and Hopson to discuss the

5

robbery, because he was on the phone with this girlfriend. In the second interview, defendant claimed that Gilliam was giving him a ride to Milwaukee Area Technical College ("MATC"), and that during the ride he was texting his girlfriend, whose name was now Vanessa. Both statements were false, as he later conceded. Defendant offered absolutely no corroboration for his claims, which I rejected as incredible. For all of these reasons and those stated in the PSR addendum, I overruled this objection.

**B.    Controlled Substances as an Object of the Offense Enhancement**

Under U.S.S.G. § 2B3.1(b)(6), "If a firearm, destructive device, or controlled substance was taken, or if the taking of such item was an object of the offense, increase by 1 level." Defendant claimed that he was not certain what the object of the activity was to be. However, as the facts recounted above make clear, this objection lacked any merit. Defendant was present at Baldwin's house when the men discussed the robbery of fourteen "bricks," street slang for kilograms of cocaine. He was present when Hopson called Turner at Baldwin's house to tell them it was time to leave. And he was present when the agent told them that this involved fourteen "keys" of cocaine and asked if everyone was straight on that.

After their arrest, defendant and Gilliam were placed in a transport van wired for sound, and they talked about the robbery, stating the "14 keys couldn't be real." (PSR ¶ 21.) Defendant claimed that this supported his argument, but I disagreed; rather, it showed that defendant knew the object of the crime was to steal fourteen kilograms of cocaine; after he learned that this was a sting, he voiced his suspicion that the cocaine could not be real. For these reasons and those stated in the PSR addendum, I also overruled this objection.

6

## C. Recency Points Under U.S.S.G. § 4A1.1(e)

Under U.S.S.G. § 4A1.1(e), "Add 2 [criminal history] points if the defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under (a) or (b) or while in imprisonment or escape status on such a sentence." Defendant conceded that he committed the instant offense in January 2008, less than two years after his May 2007 release from the 6 month sentence after revocation.

As defendant correctly noted, the Sentencing Commission has proposed eliminating these so-called "recency" points. See Federal Register Notice of Submission to Congress of Amendments to the Sentencing Guidelines Effective November 1, 2010, at 29. Barring congressional action, § 4A1.1(e) will be gone as of November 1, 2010. However, the court applies the guidelines in effect at the time of sentencing. See U.S.S.G. § 1B1.11(a); see also United States v. Deloney, 578 F.3d 690, 693 (7th Cir. 2009). The court can consider proposed changes under § 3553(a), see United States v. Angle, 598 F.3d 352, 360 (7th Cir. 2010), but as a guideline matter defendant's argument lacked merit.

## D. Attempt Reduction

In an attempt case, the base offense level is derived from the guideline for the substantive offense, with a 3 level reduction, unless the defendant completed all the acts necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control. U.S.S.G. § 2X1.1(b)(1).

I granted the 3 level reduction for the comparable co-defendants in this case, United States v. Ware, No. 09-CR-54, 2010 WL 545869, at *1 (E.D. Wis. Feb. 11, 2010); United

7

States v. Raddle, No. 09-CR-54, 2010 WL 342590, at *2 (E.D. Wis. Jan. 23, 2010), and agreed with the parties that it should apply in this case as well. As the government explained, at the time the defendants were arrested the plan and preparations for the robbery were incomplete, in that none of the defendants knew the identity of the planned victim, where the robbery would occur, and specifically how the robbery would occur. Although they knew the robbery was of a supplier of fourteen kilograms of cocaine, none knew their respective roles or how the proceeds would be divided. I agreed that given these circumstances the reduction applied. I further noted that § 2X1.1(c) provided no basis for denying the reduction, as U.S.S.G. § 2B3.1 does not expressly cover attempts. See Raddle, 2010 WL 342590, at *2.

**E.     Conclusion on Guidelines**

I otherwise adopted the PSR's factual statements as the court's findings of fact. The final offense level was 20, the criminal history category III, and the range 41 to 51 months imprisonment. I turned then to imposition of sentence under § 3553(a).[2]

## II.  SECTION 3553(a)

**A.     Sentencing Factors**

In imposing the ultimate sentence, the district court considers the factors set forth in § 3553(a):

>  (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>  (2)   the need for the sentence imposed–

---

[2]At the end of his objections, defendant indicated that he believed Milwaukee County Child Support Enforcement had received a payment from him in the form of a tax intercept, updating the information in ¶ 68 of the PSR; however, he provided no documentation of this payment. I concluded that I need not rule on this issue under Fed. R. Crim. P. 32(i)(3)(B).

8

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the advisory guideline range;
>
> (5) any pertinent policy statements issued by the Sentencing Commission;
>
> (6) the need to avoid unwarranted sentence disparities; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The court must, after considering these factors, impose a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of sentencing – just punishment, deterrence, protection of the public, and rehabilitation of the defendant. While the district court must give respectful consideration to the guidelines in determining a sufficient sentence, see Gall v. United States, 552 U.S. 38, 49 (2007), it need not accept the Commission's approach, see United States v. Bartlett, 567 F.3d 901, 908 (7th Cir. 2009), cert. denied, 130 S. Ct. 1137 (2010). Rather, the court must make an independent determination, without any thumb on the scale favoring a guideline sentence, United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007), taking into account the types of sentences available, the other relevant § 3553(a) factors, and the arguments of the parties, see Gall, 552 U.S. at 49-50.

9

**B. Analysis**

    **1. The Offense**

As discussed above, the government obtained information that a man named Eureka Hopson was in the business of committing armed robberies of drug dealers to steal their drugs and money. An undercover agent, posing as a cocaine dealer from Rochester, New York, made contact with Hopson, and they discussed robbing the agent's supplier. Hopson and the agent eventually agreed on a plan whereby they would rob fourteen kilograms of cocaine from the supplier, which they would split. The robbery was scheduled to occur on the night of January 28, 2009.

On that date, the agent and Hopson spoke, and Hopson indicated that instead of his usual partner he was bringing another partner who had several young males with him who liked to shoot. On the afternoon of January 28, the robbery participants – later to become the co-defendants in this case – gathered at the residence of Deshaun Baldwin and his girlfriend. Defendant Wilson joined them later. In the house, the men drank alcohol, smoked marijuana, and listened to music. Some time later, Hopson called Turner, the head of the assembled group, and discussed the robbery. The men left to meet Hopson, then drove to the Mitchell Domes, where they met the agent, who confirmed that they were ready. The agent then led the men to another location, where all eight were arrested. Agents seized a total of three guns.

    **2. The Defendant**

Defendant was twenty-four years old, with a pretty serious prior record for one so young, including for related conduct: a juvenile adjudication for armed robbery in 2001, in which he stole a car at gun point; then adult convictions for resisting an officer in 2004; marijuana

10

possession in 2005; and marijuana possession, resisting, and bail jumping in 2005. He performed poorly on probation in the final case, being revoked in 2007, and committed this offense about a year later. Police listed him as a member of the "Murda Mob" gang, and the PSR reported that he had the gang's name tattooed on his arms.

The record contained some positives. Defendant had two children, ages two and four, and although he owed some back child support it appeared that he tried to be involved in their lives. His current girlfriend remained supportive and said he was good with her kids. I received a positive letter from his foster mother, and his pastor made positive statements at sentencing, indicating that defendant helped out around the church and seemed sincere in his desire to turn his life around. Defendant complied with his conditions of release, submitting negative drug tests after one residual positive, a step in the right direction given his admitted history of marijuana use. (PSR ¶¶ 76-79.) He was at the time of sentencing taking classes at MATC, and I received a positive letter from his instructor. He had some work record, as set forth in the PSR. (PSR ¶¶ 84-86.) Defendant's correctional needs included substance abuse and mental health treatment (PSR ¶¶ 73-74), in addition to furthering his education and acquiring vocational skills.

### 3. The Sentence

The guidelines called for 41-51 months, and the government recommended a sentence within the range. Defendant suggested a split sentence. I found a full prison sentence necessary to satisfy the purposes of sentencing here.

Although this was a sting operation, as I noted in sentencing the co-defendants, this was nevertheless a very serious crime. Armed with handguns, these defendants agreed to engage in the robbery of a drug runner, who was also likely to be armed. The ease with which the

defendants who assembled at Baldwin's house agreed to engage in this dangerous conduct was striking, and I found that in some ways the spur of the moment nature of the offense made it worse. Prison was needed to provide just punishment and promote respect for the law. Prison was also necessary to protect the public and deter. Defendant had a fairly serious prior record for one his age, including a prior armed robbery adjudication, and lesser sentences had not deterred him.[3]

I did find that a term somewhat below the guidelines' recommendation would suffice. First, defendant's role in the offense was limited. He did not plan the robbery, provide materials, and came in very late. Second, defendant had during the pendency of this case demonstrated some positive progress – seeking to further his education, testing negative, working some. Third, he had never been to prison before. Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend. See United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). This factor did not merit significant weight here, as defendant previously served 6 months in jail, completing that sentence less than one year before he committed the instant offense.

Under all the circumstances, I found a sentence of 27 months sufficient but not greater than necessary. This sentence provided sufficient punishment, deterrence and protection of the public, given the serious nature of the crime and the danger it presented, while

---

[3] As noted above, the Commission has proposed eliminating recency points under U.S.S.G. § 4A1.1(e). But for those points, defendant's criminal history category would have been II. Nevertheless, I considered defendant's previous failure on supervision in the community and the failure of the 6 month revocation sentence to deter him from returning to crime as aggravating factors under §§ 3553(a)(2)(B) & (C).

12

acknowledging defendant's limited role and the positives in his character discussed above.

This sentence varied modestly from the guidelines, and because it was based on the particular facts of the case it created no unwarranted disparity compared to other offenders nationally. See 18 U.S.C. § 3553(a)(6). It also placed defendant fairly in this case. See Bartlett, 567 F.3d at 909-09 (holding that the district court may consider the sentences imposed on co-defendants). Travis Raddle, who received 24 months, and James Ware, who received 21 months, were comparable to this defendant as far as the conduct was concerned, and like this defendant neither cooperated with the government, but Raddle and Ware both in fell in criminal history category I and lacked this defendant's serious record. Co-defendants Brandon Bean and Johnny Gilliam, both of whom received 21 months, had prior records, but they cooperated with the government, which supported a different sentence for them. See United States v. Turner, 604 F.3d 381, 389 (7th Cir. 2010) ("A difference justified by the fact that a codefendant assisted the government, whereas the defendant did not is not 'unwarranted.'"). Defendant seemed most comparable to Gilliam, regarding both the offense conduct and prior record, but Gilliam received a 6 level U.S.S.G. § 5K1.1 departure, which supported his 21 month sentence. I declined to impose a significantly higher sentence on defendant than the others, in recognition of his very late entry into the scheme and the positives in his character discussed above.[4] This sentence was based on § 3553(a) and all the circumstances of the case, and would have been the same regardless of my findings on the disputed guideline

---

[4]As the parties recognized, Hopson (144 months) and Turner (106 months) occupied leadership positions in this offense and did not serve as apt sentencing comparisons. Baldwin's designation as a career offender under U.S.S.G. § 4B1.1 likewise made a comparison to him inapt. Based primarily on his cooperation, I sentenced Baldwin to 68 months.

13

issues.

## III. CONCLUSION

I therefore committed defendant to the custody of the Bureau of Prisons for 27 months, followed by three years of supervised release. As conditions of supervision, I ordered defendant to participate in a program of drug testing and treatment, attend to his child support obligations, participate in mental health treatment, and avoid all association or communication with the Murda Mob gang or any other gang.

Dated at Milwaukee, Wisconsin, this 15th day of June, 2010.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge